IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

GRANT K. BEATTIE,

        Plaintiff,

vs.                               Case No. 12-2596-JTM

STEVEN J. SMITH, *et al.*,

        Defendants.

MEMORANDUM AND ORDER

A guest of the Casino Hotel operated by the Prairie Band of the Potawatomi Nation reported to hotel security that she had seen another guest, plaintiff Grant Beattie, masturbating in public view while standing at the window or patio door of his hotel room. Hotel security responded to the complaint, as did police officers employed by the Tribe. Beattie was arrested on charges of lewd and lascivious behavior and disorderly conduct. He was acquitted at trial, and has brought claims against the Tribe, the Tribal Police Department, and individual officers for violation of his federal constitutional rights and under Kansas law. The Tribal defendants (the Tribe, the Tribal Police Department, and the Police Chief) has moved to dismiss the Complaint, as have the individual defendants. The

court finds that under the facts of the case as alleged in the Complaint, the defendants' motions should be granted.

*The Complaint*

The Complaint alleges that Beattie and his wife, who were both temporarily assigned to work at Fort Riley, were guests at the Prairie Band casino hotel on September 10, 2011.[1] They returned to their room on September 10, 2011, at approximately 5:30 p.m. Beattie's wife planned to go shopping while he remained in the room to watch the Michigan v. Notre Dame game. Before she left, Beattie's wife took a bath, and he told her to leave the water in when she finished because he also planned to take a bath. As his wife got dressed, Beattie got undressed down to his underwear.

When his wife was ready to leave, he walked her to the patio door in their hotel room. The Complaint alleges that it is common for hotel guests to come and go from their patio door because the central courtyard accessible through the patio door permits access to a short-cut for re-entering to the casino. The patio doors and windows of the guest rooms are made of glass, and two curtains are made available to cover the door and window. One of the curtains is made of solid fabric; the other is made of sheer material permitting limited visibility.

---

[1] The Complaint alleges that Beattie and his wife are federal contractors with Security Clearances issued through the United States Office of Personnel Management. Beattie is a former Marine, and obtained his Secret Security Clearance in April of 2006. In order to obtain that Clearance, plaintiff underwent a rigorous background investigation for approximately two years.

When Beattie's wife was leaving the room, the solid curtain was closed over the entire window. The sheer curtain was fully closed over the door and window. Beattie's wife pulled the sheer curtain out of the way just enough to open the door when she left. Beattie kissed his wife goodbye at the door, closed the patio door, and remained at the door while he watched her walk across the courtyard to the casino.

According to Beattie, as he watched his wife, he used his left hand to hold the top portion of the sheer curtain open, and his right hand to hold the lower portion of the sheer curtain closed, in order to avoid being seen standing in his room in his underwear.

At or around the same time Beattie's wife left their hotel room, hotel guest Willimena Robinson was in the courtyard/pool area with several members of her family, and reported to a hotel clerk that she witnessed a man looking out the window of Beattie's room and masturbating.

Casino Security Officer Maria Huske was dispatched to meet Robinson. Robinson told Huske that "she saw another guest in his hotel room open his window shade [and] wrap it around his neck while he actively masturbated." Huske returned with Robinson to the area. In a written statement, Huske said she saw a guest pull back the shade, and that he "had on a black t-shirt and [she] did not see that he was wearing either pants or underwear." In a videotape statement given to Tribal Police Officer Ryan Bauer, Huske said that she did not see the man's genitalia, and that, "to be honest," she didn't even know whether Beattie was wearing underwear because his black t-shirt was "quite long" and came down to his "mid-thigh level." In her reports, Huske never stated she saw or told

anyone that Beattie (or any other guest) had been masturbating or exposing himself through his window.

Huske reported to Casino Security Supervisor Jeremy Rodecap, who told the security department dispatcher to contact the Tribal Police. Officer Bauer and Officer Steven Smith arrived shortly after 6:10 p.m.

Bauer established initial contact with Robinson when he arrived, but never interviewed Robinson until after he and Smith arrested Beattie.

Officer Smith never interviewed or spoke with Robinson. He walked to the pool area and met with Huske. According to Smith's report, Huske told him that "She seen the male standing in the window without any pants on and he was masturbating. She advised that he was wearing a black shirt." As noted earlier, Huske's report of this incident states nothing about seeing the male guest masturbating in his window. Security Supervisor Beth James told Smith of Robinson's location, but he declined to interview her, and instead joined Bauer at Beattie's patio door.

Beattie states in his complaint that he noticed Bauer and Smith standing outside his door. He unlocked and opened the door, and asked them what was going on. They asked if they could come inside and talk to him, and he agreed. As they entered his room there was an additional knock, and the Tribal police told Beattie to let them in as well. Beattie complied, and allowed an additional male security employee and Huske enter the room.

Smith was at the scene for a total of nine minutes before he arrested Beattie and took him to jail.

While they were talking, Bauer ran a criminal history check on Beattie, which reflected no prior incidents, and indicated that Beattie had no criminal history. The results of the criminal history check were then reported to Smith during his interrogation of Beattie.

Smith asked Beattie what he was doing in his room, and he told the officers he was watching a football game. Smith repeatedly asked what Beattie was doing in the room. Beattie states that he did not understand what was going on, and said, "I don't know what happened but you've got the wrong person." Smith arrested Beattie and read him his rights, asked whether he understood them, and then asked whether he'd still be willing to talk to him.

Smith handcuffed Beattie, and told him he had been seen by two witnesses masturbating. Beattie said "he could not believe someone would say that and accuse him of that because he did not do that." Beattie asked Smith, "If I'm standing near the glass doing what you say, then why don't you have 50 people or 100 people saying this?"

According to Smith's report, Beattie then "proclaimed that he was a government contract worker and that he had a high level security clearance and that he would not jeopardize it by doing something like this." Smith told Beattie that his work "has absolutely no bearing on this incident."

Smith and Bauer walked Beattie through the hotel and lobby, and put him in the back of Smith's police vehicle. According to police logs, Officer SMITH was at the scene for a total of nine minutes. Smith told Bauer to remain behind at the scene and collect witness

statements. According to Bauer's report, Robinson told him that she and Huske both saw Beattie masturbating in his window.

Smith drove Beattie to the Jackson County Jail, where he told Beattie, "Just so you don't act surprised or say nobody ever told you…since there was children in the area, it will be a felony offense. Beattie was arrested for lewd and lascivious behavior, in violation of K.S.A. § 21-5513 (a felony), and disorderly conduct, in violation of K.S.A. § 21-6203 (a misdemeanor). Smith told Beattie that any time Tribal Police charge some one with lewd and lascivious behavior, they also charge them with disorderly conduct. Beattie posted a $7,500 bond the following day.

On September 30, 2011, Jackson County Attorney Shawna Miller filed a criminal complaint, charging Beattie with Class B misdemeanor lewd and lascivious behavior and misdemeanor disorderly conduct. With respect to the disorderly conduct charge, the complaint alleged that Beattie unlawfully and intentionally, knowingly, or recklessly used fighting words or engaged in noisy conduct tending to reasonably arouse alarm, anger, or resentment in others and, that he knew or should have known that such acts would alarm, anger, or disturb others or provoke an assault or other breach of the peace.

The same day, Smith submitted an affidavit stating that he conducted an investigation of the allegations, and he believed there was probable cause to charge Beattie.

Beattie was tried and found not guilty on both charges. Bauer, Huske, James and Rodecap did not appear at the trial. Huske was subpoenaed to appear. Robinson testified at the trial.

Beattie alleges that after his employer learned about the pending charges, he was "sidelined" from his job based on the strong likelihood of eventually losing his Secret Security Clearance.

The Complaint stresses that "[n]o one in Robinson's own family corroborated her own story."

The Complaint asserts four claims under 42 U.S.C. § 1983. Three of these are advanced against the individual defendants Smith, Bauer, James, Huske, and Rodecap: Count 1 seeks recovery for summary punishment and denial of due process in violation of Beattie's rights under the Fifth and Fourteenth Amendments; Count 2 seeks recovery for false arrest in violation of the Fourth Amendment; and Count 3 seeks to recover for malicious prosecution. Count 4 advances a § 1983 claim against the Tribal Police Department, and its Chief, Michael Boswell, for their policies leading to Beattie's injuries. The remaining claims assert violations of Kansas law. The individual defendants are charged with unlawful arrest (Count 5) and malicious prosecution (Count 6). Chief Boswell and the Tribal Police Department are charged with negligent supervision (Count 7) and negligent training (Count 8).

*Individual Defendants*

The individual defendants argue that the claim of a deprivation of due process in Count 1 is subject to dismissal because Beattie received a trial on the charges and make no allegation in the complaint that the trial was an unfair one. With respect to the remaining

claims, the defendants argue that they are subject to dismissal because probable cause existed to arrest Beattie. *See Graham v. Connor*, 490 U.S. 386, 396-97 (1989) (no claim under Fourth Amendment for arrest based on probable cause); *Taylor v. Meacham*, 82 F.3d 1556, 1560 (10th Cir. 1996) (probable cause is a defense to claim for malicious prosecution). Even if probable cause did not exist, they argue, the action should be dismissed because they are protected by qualified immunity, which protects police officers who "reasonably but mistakenly" conclude that their conduct comports with constitutional requirements are entitled to immunity. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

The individual defendants also argue that the state law claims against them are barred by the discretionary function exception to KTCA liability. Under that exception, no liability will attach for a claim based upon "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved." K.S.A. § 75-6104(e). The exception has been specifically applied to allegations of negligence in the investigation of criminal charges. *See Soto v. City of Bonner Springs*, 291 Kan. 73, 238 P.3d 278 (2010); *Mendoza v. Reno County*, 235 Kan. 692, 681 P.2d 676, 678 (1984); *Burney v. Kansas Dept. of Social and Rehabilitation Servs.*, 23 Kan.App.2d 394, 931 P.2d 26 (Kan. App. 1997).

In his Response, Beattie argues against any dismissal of the action, invoking both the need for additional discovery, and the general preference for the resolution by jury of contested issues such as probable cause. *See DeLoach v. Bevers*, 922 F.2d 618, 623 (10th Cir.

1990). But this preference exists where facts are actually contested or some mystery exists as to the actions of the parties. Here, defendants have conceded (for purposes of the motion) all of the facts alleged by Beattie in his complaint. Further, qualified immunity is not simply immunity from liability, it "is an immunity from suit rather than a mere defense; and ... is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in *Mitchell*), *overruled in part and on other grounds, Pearson v. Callahan*, 555 U.S. 223 (2009). Accordingly, "a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. *Id.* at 200.

Beattie provides no direct response to the defendants' contention that his Fifth Amendment due process claim is precluded by his failure to show or allege the existence of an unfair trial. He argues, however, that under the Fourteenth Amendment he had a right to reasonable post-arrest investigation of the criminal charges against him. (Dkt. 21, at 29). But such a claim must rest on more than mere negligence. *Romero v. Fay*, 45 F.3d 1472, 1478 (10th Cir. 1980). And here the Complaint fails to make any showing of how the post-arrest investigation either deliberately sought to deny him due process, or was conducted recklessly towards that result. Beattie points to relatively minor inconsistencies in the reports of the investigating officers and makes suggestions as to what they might alternatively have done. But these at most would establish negligence, and do not establish the sort of culpability that is a prerequisite for § 1983 liability.

9

The court finds that the information available to the defendants on September 10, 2011, supplied probable cause, and accordingly determines that Counts 2 and 3 should be dismissed. Beattie points to a number of cases in which courts have found probable cause did not exist, but all of these cases are readily distinguishable, and all involve instances in which officers have made arrests based on patently irrelevant, unreliable or insufficient evidence. By its nature, probable cause is a fact-intensive inquire, and is decided on a case-by-case basis. *Romero v. Fay*, 45 F.3d 1472, 1476 (1995). Here, the officers had received information from an eyewitness who affirmatively and directly stated that Beattie had been masturbating in his window.

There is no indication that they ignored readily available exculpatory information. Beattie makes much of the fact that the Tribal Police did not directly interview Robinson, there is no indication that she would have supplied exculpatory information. Robinson held to her story and testified against Beattie at his trial. At most Beattie has identified some minor inconsistencies in the reports of the officers which could, and apparently did, supply grounds for cross-examination of Robinson at the trial. But the alleged facts fail to show that, at the time to the arrest, Robinson was so totally lacking in credibility that they were bound to ignore her complaints. The court finds that, based upon all of the circumstances known to them at the time, the investigation officers had probable cause for an arrest. Given the direct statement from an eyewitness, the officers were not bound to ignore her and give credence instead to Beattie's declarations of innocence. *See Romero*, 45 F.3d at 1480.

Even assuming no probable cause existed, the court finds that the officers were protected by qualified immunity. That doctrine, with its focus on whether the officers violated a clearly established right of the plaintiff, is applied in light of "the specific context of the case, not as a broad general proposition." *Saucier*, 543/3 U.S. 194, 199 (2004) (internal citations omitted). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Bryant*, 502 U.S. 224, 227 (1991). Here, the court finds that a reasonable officer in Smith's position, lacking any exculpatory evidence which would negate the direct import of Robinson's complaint, would have been justified in arresting Beattie. The plaintiff has failed to either show the defendants violated a clearly established right in the context of the circumstances of the case, or show that the officers acted incompetently or in knowing violation of the law.

With respect to the state law charges, the court agrees that these claims are subject to the discretionary function exception to the KTCA. The officers investigating the reported crime acted in a discretionary function. "[An] officer's decision how to investigate" criminal complaints is "of the 'nature and quality which the legislature intended to put beyond judicial review.'" *See Soto v. City of Bonner Springs*, 291 Kan. 73, 87, 238 P.3d 278, 287 (2010) (quoting *Bolyard v. Kansas Dep't of SRS*, 259 Kan. 447, 452, 912 P.2d 729 (1996)). Here, the decisions of the individual defendants in determining how to investigate the charges against Beattie were clearly discretionary, and accordingly no liability for these claims exists under the KTCA.

Finally, the defendants' motion argues that the Complaint lacks any allegations of wrongful conduct against Hotel Security Officers Huske, James, and Rodecap. Beattie responds that the Complaint specifically stresses that the hotel security officers were clothed in the authority of state law. But Beattie must do more that simply show that the officers acted under color of state law. He must specifically allege how they caused the alleged constitutional deprivation. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Here, the allegations show only that Huske made a report, based upon her interview with Robinson, and that James later told the Tribal Police where they could find Beattie. They were present while the Tribal Police officers interrogated Beattie, and decided to press charges, again based on the word of one of their other guests. Even assuming that the Tribal Police should have conducted a better investigation, the plaintiff has failed to show how these hotel employees are legally responsible for the actions of the Tribal Police, or that the hotel employees had a duty to intervene in the police investigation. Accordingly, notwithstanding the court's other findings, defendants Huske, James, and Rodecap are in any event entitled to the dismissal of the claims against them.

*Tribal Defendants*

The Tribal defendants moved to dismiss the Complaint on multiple grounds. They argued that the Tribal Police are merely a law enforcement agency of the Prairie Band, and cannot be sued directly. Second, they argued that the Tribe is not a "person" amenable to suit under § 1983. *Inyo County v. Paiute-Shoshone Indians*, 538 U.S. 701, 711-12 (2003). Third,

even if the Tribe were are such a "person," it has retained its sovereign immunity to suits under § 1983. *See Nanomantube v. Kickapoo Tribe in Kansas*, 631 F.3d 1150, 1151 (10th Cir. 2011). And even if the Tribe was not immune to suit, Beattie's claims under Count 5 do not show that any supposed policies actually caused him an injury, and he has failed to exhaust his administrative remedies under the Federal Tort Claims Act (FTCA). With respect to Counts 7 and 8, the Tribe argues that the Complaint fails to demonstrate any violation of a duty owed particularly to Beattie, as opposed to the public in general. *See Robertson v. City of Topeka*, 644 P.2d 458, 463 (Kan. 1982).

In his Response, Beattie abandons most of his previous allegations against the Tribal defendants, and explicitly withdraws Counts 4, 7, and 8. He states that he now

> alleges only one theory of liability against [the Tribe] and [the Tribal Police] under the KTCA: vicarious liability based on the "negligent or wrongful acts or omissions" of [the individual defendants] within the meaning of K.S.A. § 75-6103. Plaintiff alleges only one theory of liability against [Chief Boswell] in his individual capacity: a supervisory capacity claim pursuant to 42 U.S.C. § 1983.

(Dkt. 24, at 2).

With respect to the specific allegations made against the Tribe and the Tribal Police made in the Response, the defendants in their Reply reiterate their argument that the Tribal Police Department remains an entity not subject to suit. In his Response, Beattie concedes no case law directly supports the result he desires, but relies on K.S.A. § 22-2401a(3)(b), which he contends recognizes such actions against tribal police departments. The statute, however, merely holds that, in actions against tribal police departments, the employing

tribe is deemed the State. Accordingly, just as with police departments generally, tribal police departments are not jural entities capable of being sued. *See Wright v. Wyandotte County Sheriff's Dept.*, 963 F. Supp. 1029, 1034 (D. Kan. 1997). Accordingly, the plaintiff's claims against the Tribal Police Department are dismissed.

Further, it must be noted that the Complaint advances no specific allegation against the Tribe or the Police Department in Counts 5 or 6, and makes no mention at all of the Tribe in Counts 7 or 8. Accordingly, it is not clear where in the Complaint he would seek to ground his newly stated vicarious liability state law claim against the Tribe. Beattie does cite *Estate of Belden v. Brown County*, 261 P.3d 943 (2011) for the proposition that it is unnecessary to plead any claim against a municipal entity, so long as the complaint raises claims against subordinate agents. This reads *Belden* far too broadly, as the court in that case merely held that, for statute of limitations purposes, an earlier action against municipal agents would have given notice to their employer of impending liability.

The Tribe also argues plaintiff's claims are precluded by his failure to exhaust administrative procedures under the Federal Tort Claims Act. Plaintiff argues that compliance with the FTCA is not required, and contends that the Tribal Police should not be considered federal agents for purposes of the Act, relying on *Gallegos v. Jicarilla Apache Nation*, 97 Fed. Appx. 806, 811-812 (10th Cir. 2003). The Tribe argues that *Gallegos* is not controlling, as in that case the Tenth Circuit simply held that the mere fact that tribal officers were acting to enforce federal law was insufficient by itself to transform them into federal agents for purposes of the FTCA, whereas in the present action the Tribe has

14

presented evidence in the form of its 638 Self-Determination contract with the Department of the Interior.

The court finds that the exhaustion of administrative remedies is not required. The 638 Self-Determination merely indicates that the Tribe retained its immunity to actions under § 1983, and that "nothing *in reference to this contract* ... shall be construed as ... affecting, modifying, diminishing, or otherwise impairing the sovereign immunity from suit enjoyed by an Indian Tribe." (Emphasis added). The 638 Self-Determination does not suggest that the Tribe could not waive its immunity in other respects. By its Compact with the State of Kansas subjecting itself to the KTCA, it has done precisely that, and without any requirement of administrative exhaustion. Notably, the Tribe only cites cases applying FTCA exhaustion in general, and none holding that FTCA exhaustion is required as a condition precedent to actions against Tribes who have otherwise consented to state tort claims.

However, given the court's findings with respect to probable cause and the discretionary function exception, the Tribal defendants are also entitled to dismissal of the state law claims advanced under the KTCA.

IT IS ACCORDINGLY ORDERED this 7th day of February, 2013, that the defendants' Motions to Dismiss and for Judgment on the Pleadings (Dkt. 12 and 14) are hereby granted.

                                                   s/ J. Thomas Marten
                                                  J. THOMAS MARTEN, JUDGE